## GIBBS *v.* DAYTON.

1. AUTOMOBILES—HIGHWAYS AND STREETS—DECLARATION—PLEADING—VARIANCE.

   Proof that decedent on a bicycle was riding in a southwesterly direction across a street when he was run down by defendant's automobile proceeding in a southerly direction, is a variance from the allegations of a declaration charging that decedent was proceeding in a northerly direction along the east side of the street.

2. SAME—NEGLIGENCE—PERSONAL INJURIES.

   The driver of an automobile which ran down decedent as he attempted to pass in front of it on his bicycle while the car was crossing from the right to the left side of the street was not as a matter of law free from negligence.

3. SAME.

   But as decedent could have seen the automobile if he had looked, and if he did see it, should not have attempted to pass in front of the car, he was guilty of contributory negligence, and he was equally guilty if he failed to look.

Error to Kalamazoo; Knappen, J.   Submitted April 18,

1911. (Docket No. 57.) Decided June 2, 1911. Rehearing denied September 29, 1911.

Case by Leon Gibbs, administrator of the estate of Robert I. McCorkle, deceased, against Edward J. Dayton and Albert E. Rose. A judgment for defendants on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*Jackson & Fitzgerald*, for appellant.

*E. M. Irish*, for defendant Dayton.

*Alfred J. Mills* and *George V. Weimer*, for defendant Rose.

BLAIR, J.   Plaintiff instituted this suit to recover damages for the death of his intestate, alleged to have been occasioned by the negligent operation of an automobile by certain agents and employés of the defendants, whereby the machine collided with a bicycle upon which the decedent was riding.   The defendant Rose at the time of the accident was engaged in business as an architect, and had in his employ as a draughtsman Robert Groves, who also drove his Buick machine for him most of the time.   The defendant Dayton was engaged in the business of selling, repairing, renting, and keeping automobiles, and employed as a sales manager William Orrell.   The defendant Dayton was the owner of a Columbia machine, which Orrell was endeavoring to sell to Rose, and had discussed the matter with him a few days prior to the accident.   On the morning of the day of the accident, Rose and Groves were out on business with the Buick, which they left on their return with defendant Dayton; and Rose, on leaving, instructed Groves to bring the Buick to the office after dinner. Some one at defendant Dayton's garage telephoned to Rose that the Buick was not working, that Groves was outside, and asked whether they should bring the Columbia over, to which he replied, "All right, come along, and bring it over."   For some time prior to the accident, Or-

rell and Groves had been riding about the city in the Columbia. Orrell testified:

"*Q.* You told Groves something about operating the machine?

"*A.* Yes, sir.

"*Q.* You were making an effort at that time to teach Groves to run the machine so you could sell it to Rose?

"*A.* Yes, sir.

"*Q.* It had been out a little while before you made this trip and come around to the garage and stopped there, and then made this last trip, did it?

"*A.* We had been out before that and left the garage immediately before this accident.

"*Q.* You went out early in the afternoon?

"*A.* Yes, sir.

"*Q.* And went to the garage and stayed there?

"*A.* Yes, sir.

"*Q.* And, then made this trip as you say down Burdick street to Eleanor street and south on Rose street?

"*A.* Yes, sir."

The only eyewitness who described the collision testified that the automobile passed him on his bicycle at the rate of 12 to 15 miles an hour, going in a southeasterly direction along Rose street:

"I was here on Rose street, was coming off Main street on my bicycle at the time of the accident. I came down Main street from the west, and turned south on Rose street. * * * I did not see any automobile coming on North Rose street when I was on Main street. As I went south on Rose street, I did hear an automobile from the rear. It came from Main street, and followed me down. I came off Main street onto Rose and the horn blew, and, as I looked over, the machine was pretty close to me, and I sheered out to let the machine go by, out on to the west side of Rose street, and about where this walk to the courthouse comes out on to Rose street. That was probably about seven or eight rods from Main street. I noticed the automobile after it passed me. It came east on West Main street, and I was on Main street, and I turned on Rose street, and the machine followed right around and the horn blew, and, as I got out of the way of the machine, the machine took a diagonal course as it would have to, to land in front of the gashouse—took a

diagonal course across the street, when it passed me, and continued right along that way, and landed in front of the gashouse on the east side of South Rose street near Academy street, that would be on the left-hand side of the street. * * * As this automobile passed me going across the street in this way [illustrating], there was a young man on a bicycle starting from the east side of Rose street, I should judge, as I can remember, in front of that plumbing establishment or Pattersons. I saw him get on his wheel and start across the street toward Academy street. As he got about midway in the street, he saw this machine and started to turn.

"*The Court:* I think that part should go out, 'that he saw the machine.'

"*Witness* (continuing): He started to turn on his bicycle, and, as he had his bicycle turned, he had it turned sharp, and you know, if you turn a bicycle sharp enough it will partially balance itself. He had his wheel right on that balance. He got it in that position. That is the condition he had his bicycle, and the machine struck the bicycle right in the front wheel.

"*Q.* Where was this in reference to the center of the street?

"*A.* Well, of course, I cannot tell you whether right exactly in the center of the street or not. It was about in front of the Academy there, not a great ways from the center of the street. If not in the center, it was more on the east side than on the west. * * *

"*Q.* About how far from where the machine passed you was it before it struck the boy?

"*A.* I should judge—I don't think it was more than four or five rods. * * *

"*Q.* I understood you to tell me you were trying to get out of the way of the machine?

"*A.* I did when I found out the machine was coming on Rose street. I turned off Main street to get away from it on Main street. I did not know at that time it was coming on Rose street.

"*Q.* Didn't you tell the jury you heard the horn of that machine blowing on Rose street and you got out of the way of it?

"*Witness* (continuing): I don't think I said on Rose street. I heard it tooting on Main street. I heard it on Rose street, and tried to get out of the way. I don't remember how near I was when I first heard the noise. I

don't remember the exact spot. I was on Rose street somewhere at that time. * * * I looked around and saw this machine when it was turning the corner from Main on to Rose street. * * *

"*Q.* Where was the boy when you first saw him?

"*A.* Getting on his wheel on the east side of the street. * * * He started west, but he did not go straight west; took a little bit diagonal cross, southwest. * * *

"*Q.* The automobile started across the street towards the gas works?

"*A.* Yes, sir.

"*Q.* This boy got on his wheel and rode directly across the path of the automobile, didn't he?

"*A.* It seems so.

"*Q.* Did you notice whether he looked to see whether any automobile was coming?

"*A.* I only judge by his actions. He turned on his wheel—turned around.

"*Q.* I ask you whether you noticed whether he looked to see whether any automobile was coming?

"*A.* He turned his head towards the automobile.

"*Q.* Looked towards the automobile before he got on his wheel?

"*A.* I don't know what he saw, or what he looked at or anything.

"*Q.* Did he look before he started on his wheel?

"*A.* I don't know as I know whether he looked or didn't look, from the fact that I was not by the side of him.

"*Q.* Did you notice? You cannot tell whether you did or not?

"*A.* Well, all I know is what he done with his wheel.

"*Witness* (continuing): I have ridden the wheel I am now riding about 10 years. I would not think a wheelman when he steps on his wheel first has motion enough to keep it under control so he can dodge quickly. It is the common experience of wheelmen that, when you mount a wheel, you do not get headway enough to dodge quickly, or keep out of people's way."

Groves and Orrell were called by plaintiff for cross-examination under the statute, but were not questioned as to the circumstances surrounding the collision. Rose street is an important business street, and at the point where the collision occurred is paved from curb to curb, a

distance of 67 feet. The deceased, the eyewitness, Lawn, and the occupants of the automobile, appear to have been the only persons using the street at the time. The accident occurred in the middle of the afternoon of May 14, 1909.

The substance of the negligence alleged in the declaration is that the driver of the automobile, Groves, was not a licensed chauffeur, as required by statute; that while Robert McCorkle, a strong, healthy boy of the age of 14, and in possession of all of his faculties, was proceeding carefully and prudently in a northerly direction east of the center of Rose street, and without any negligence on his part, he was struck by the automobile proceeding in a southerly direction on the east side of the street, "then and there being driven by the said Robert G. Groves at a high and unlawful rate of speed and in a careless and negligent and unsafe manner." The circuit judge directed a verdict for defendants, and plaintiff brings the record to this court for review upon writ of error.

It is apparent that the proofs do not support the declaration, which alleges a head-on collision, while decedent was proceeding in a northerly direction along the east side of the street, whereas, as shown by the proofs, decedent was attempting to cross the street in a southwesterly direction. Perhaps this variance might be obviated by amendment. *Schindler* v. *Railway Co.*, 77 Mich. 136 (43 N. W. 911).

We are not prepared to hold as a matter of law that there was no evidence of negligence on the part of the automobile driver, but we are of the opinion that plaintiff failed to discharge the burden of proof resting upon him to show absence of contributory negligence on the part of decedent.

The boy was experienced in the use of the bicycle and in riding about the streets in the course of his employment as a delivery boy. There was nothing to obscure his vision, and he had only the automobile and the other bicycle to avoid on a paved street 67 feet wide. If he had looked

when he started to cross the street, he must have seen the oncoming automobile a few rods away, in which event it would have been negligent to attempt to cross directly in front of it. If he did not look until the automobile was upon him, he did not exercise common prudence. *Zoltovski* v. *Gzella,* 159 Mich. 620 (124 N. W. 527, 26 L. R. A. [N. S.] 435, 134 Am. St. Rep. 752). In view of this conclusion, it becomes unnecessary to consider the other interesting questions presented by the briefs.

The judgment is affirmed.

MOORE, MCALVAY, BROOKE, and STONE, JJ., concurred.