HENRY *v.* MICHIGAN CENTRAL RAILROAD CO.

RAILROADS—DUTY TO LOOK—CONTRIBUTORY NEGLIGENCE—INFANTS
—PERSONAL INJURIES—KNOWLEDGE OF DANGER.

    Plaintiff, a boy of nine years and six months, who looked
only one way in crossing defendant's three tracks, and,
after a train had passed on one of them, attempted to go
across and was struck by a train that approached from
the other direction, where he had passed over the crossing
frequently, knew the danger at the same and realized
that it was his duty to look out for trains, etc., could not
recover for the injuries that he sustained; he should have
been held guilty of contributory negligence by the trial
court, as matter of law.

Error to Bay; Connine, J., presiding. Submitted
October 19, 1915. (Docket No. 8.) Decided December
21, 1915.

Case by John E. Henry, by his next friend, against
the Michigan Central Railroad Company for personal
injuries. Judgment for plaintiff. Defendant brings
error. Reversed; new trial refused.

*George M. Humphrey* (*Cooley & Hewitt* and
*Humphrey, Grant & Humphrey,* of counsel), for appellant.

*Defoe, Hall & Converse,* for appellee.

STONE, J. This is an action on the case to recover
damages for injuries sustained by the plaintiff, an infant, suing by his next friend. The injury is alleged
to have been caused on February 25, 1914, by the
negligence of the defendant in the operation of one of

its engines, over Mosher street crossing, in the city of Bay City, while plaintiff was crossing defendant's tracks, about 1 o'clock p. m. of that day.

In the court below plaintiff had a verdict and judgment for $1,100, and the defendant has brought the case here for review upon a writ of error. At the time of the injury, plaintiff was 9 years and 6 months of age, and was attending the Corbin School in said city. He was a bright, intelligent boy. At the time, he was on his way to school with his younger brother, who was then about 8 years old. Plaintiff's home was some distance to the east of Mosher street crossing, and the Corbin School was six blocks to the west and south, the other side of the tracks; so that he could not go from his home to said school without crossing defendant's tracks. His home had been in the same place for 6 or 7 months. After he started, when school opened in the fall, he continued to go from his home to the school twice a day, going home for dinner, a part of the time going over the Mosher street crossing and part of the time over the State street crossing farther to the south and east. The Mosher street route was about a block the shorter. Plaintiff had crossed back and forth, just as he was doing on the day of the accident, many times, was entirely familiar with the surroundings, and had been warned by his mother concerning this particular crossing, before this day.

Mosher street crossing is in West Bay City, some distance north of the West Bay City depot, and there were three sets of tracks of the defendant's railroad over it, running approximately northwest and southeast, with about 8 feet between each set of tracks, the most easterly being the north-bound track, the middle being the south-bound track, and the most westerly track being a siding. King street, lying east of the place of the injury, runs approximately north and south, and at right angles to Mosher street. The railroad tracks

angle across both streets, and cross King street about 150 feet to the south of the Mosher street crossing, it being about 87 feet from the center of the intersection of the two streets to the most easterly rail on Mosher street, and about 107 feet from the same point to the most easterly rail on King street; and on that triangular piece of ground, bounded on the north by Mosher street, on the east by King street, and on the south and west by the railroad tracks, there is nothing except a pole upon which the sign "Railroad Crossing" is placed. The elevation of the tracks all along there is from 3 feet to 3 feet 6 inches higher than the elevation of King and Mosher streets at the point of their intersection, there being a rise in the grade of each street from the point of their intersection to the crossing of each with the tracks. The tracks run approximately straight for a considerable distance north of Mosher street, and perfectly straight for a distance of more than three blocks to the south, where there is a slight curve to the west, and all three of these tracks are used almost continuously for the operation of trains, backwards and forwards, between the yards and the depot. Mosher street runs approximately east and west, and is unpaved. Upon the day in question, some four blocks before reaching the crossing where the plaintiff was injured, he and his brother passed what is called the French School, and the schoolboys at that school threw snowballs at the plaintiff and his companion. The plaintiff and his brother threw snowballs back, and the boys from the French School began chasing the plaintiff and his brother, and chased them from the school up to the tracks, the boys following the plaintiff and his companion as far as King street, and some of them farther. Plaintiff testified that he ran up to the tracks and the boys were still behind him until he arrived at the tracks.

The line of vision of a person approaching the tracks

on Mosher street, after reaching the intersection of King and Mosher streets, is right down King street to the south, and a view of the tracks where they cross the east line of King street southerly of the center of Mosher street crossing was unobstructed. As a person proceeded west on Mosher street toward the tracks, the line of vision was across this open, triangular piece of ground. The only claimed obstruction to plaintiff's view was a bank of snow which extended about 6 or 7 feet east of the track, and to the south of the team track or traveled portion of the highway in Mosher street.

Just prior to the accident an engine pulling some cars on the middle track ran over the Mosher street crossing at from 10 to 15 miles an hour, from the north toward the depot on the south; and the engine which struck the plaintiff, having pulled a train from Detroit to Bay City, and having left the coaches in the West Bay City coachyard, was proceeding north on the most easterly track at from 6 to 14 miles an hour to the roundhouse, running with the engine tender foremost.

The noise of the approaching engine was distinctly heard by two of the plaintiff's witnesses, just prior to the accident, when they were from 50 to 100 feet farther from the engine than was the plaintiff. These two engines, the one running on the south-bound or center track from the north toward the depot, and the engine which caused the injury to the plaintiff running with the tender foremost from the depot toward the north on the north-bound, or most easterly track, passed each other just to the south of Mosher street crossing, or somewhere between that crossing and the King street crossing opposite this triangular piece of vacant land. The next street east of King street, and parallel with it, is State street, and the next street south of Mosher, and parallel with it, is Hart street.

A synopsis of the testimony of plaintiff upon his direct examination will show what he claims to have been the facts. The plaintiff testified that on this occasion, on going back to school after dinner, he went down State street until he came to Mosher street, and then went down Mosher. He testified that there were three tracks at the Mosher street crossing; that he saw an engine on that occasion as he went toward the crossing, and that, as the engine passed him southerly, he was right by the edge of the snowbank, about 6 or 7 feet away from the track—easterly track; that engine went toward State street; that he stood there and waited until it went by, and then began to cross; that when the engine went over the crossing he watched it a rod or more, and then went across; that he couldn't see it go any farther than where he watched it, because of the snowbank; that he was on the south side of the road; that when he got to King street, from there on until the crossing was reached, there was no sidewalk on the north side of Mosher street, and so he went over on the middle of the road. He testified that he did not walk on the sidewalk on the south side because it was all snow banked up; that he stood while waiting there about in the wheel tracks, a little on the south side; that he saw no other engine coming at that time, and he started ahead. He did not hear any engine come, or any bell or whistle; that he did not see what struck him. The undisputed evidence shows that the plaintiff was struck and knocked down at that point by the northwest portion of the tender just as he was passing off the west rail of the east track, and was thrown to the west and outside the track. Upon the cross-examination of the plaintiff he testified:

"Q. You crossed this crossing there on your way to school a lot of times, had you not?
"A. Yes, sir.

"*Q*. Going back and forth just as you were on this day?

"*A*. Yes, sir. There were three tracks there.

"*Q*. Had you ever seen trains going over there and had to wait for trains before?

"*A*. Yes, sir.

"*Q*. Did you very often have to do that?

"*A*. Yes; quite often.

"*Q*. How was it, are there lots of trains that go across the tracks there or only a few,

"*A*. Oh, there is a few, but pretty nearly every time I went there I would have to wait.

"*Q*. Pretty near every time you would go along there there would be a train around there somewhere, would there? On one of those three tracks?

"*A*. Yes, sir. I didn't notice whether the trains ran on only one track or on all three tracks, but I remember seeing them on different tracks, not this particular day, but I mean any time.

"*Q*. You do remember seeing them on different tracks?

"*A*. Yes, sir.

"*Q*. Sometimes they would be on one, and sometimes on the other?

"*A*. Yes.

"*Q*. Pretty near every day when you would go along there you would see a train on some track?

"*A*. Yes, sir.

"*Q*. Did you see trains run both ways there when going by, I don't mean this day, but when going to school there, would sometimes a train go one way and sometimes another?

"*A*. Sometimes there was. And sometimes they would all be going one way. This crossing is about four blocks from the French School. * * *

"*Q*. Had you ever noticed when you were going to school that an engine went up those tracks?

"*A*. Yes, sir.

"*Q*. Have you seen that engine before on some days, that is, an engine without any cars?

"*A*. Yes, sir.

"*Q*. When you went along Mosher street at about 1 o'clock on your way to school, did you almost always see that engine go by there?

"*A.* Almost.

"*Q.* That is from the depot up to the north?

"*A.* Yes, sir. * * *

"*Q.* And that went by pretty near every day when you went by, didn't it?

"*A.* Yes, sir.

"*Q.* When you were on your way back to school?

"*A.* Yes, sir.

"*Q.* Did you usually go back to school about the same time every day?

"*A.* Yes, sir; I went back about the same time every day, and I tried to get there to be at school when the first bell rang. I was a little late on this day. I was quite late. We was a little late getting my dinner, I guess.

"*Q.* Were you in a hurry this day?

"*A.* Yes, sir. When I went by the French School the school boys were out around the school.

"*Q.* Did they throw snowballs at you?

"*A.* Yes, sir.

"*Q.* Did you throw snowballs back at them?

"*A.* Yes, sir. My brother was with me and helped me in my snowball fight with the boys at the school, and we threw snowballs back and forth the two of us, with the boys at the French School. I didn't know how many of those boys there were, but there were more than two. There was a whole big gang of them.

"*Q.* Were they chasing you?

"*A.* Yes, sir; they were chasing me.

"*Q.* And throwing at you?

"*A.* Yes, sir.

"*Q.* How far did they chase you?

"*A.* They chased me from the school pretty near to the tracks where I got hurt. We fought them off awhile and then had to run away from them. There were too many of them. When I ran away from them I ran until I came to Mosher street and then I turned down Mosher street.

"*Q.* Did you run down Mosher street?

"*A.* Yes, sir; and they followed me as far as King street, and then they began to go back. Some of them came farther than others.

"*Q.* They chased you farther. How far did you keep on running? Did you run clear up as far as the tracks?

"*A.* I run clear up until I had to wait for the switch engine.

"*Q.* You run clear up to the tracks, did you?

"*A.* Yes. When I got up there, there was an engine that was going across the tracks, so I had to stop and let it go by.

"*Q.* Do you know whether the boys were still after you or not at that time?

"*A.* They was after me then, too.

"*Q.* They were after you while you were waiting there?

"*A.* Yes, sir; I started on again.

"*Q.* Did you think they were still after you?

"*A.* No, sir; I did not.

"*Q.* They went back while you were waiting for this engine, did they?

"*A.* No, sir; I didn't think they was after me yet. I didn't think so.

"*Q.* But you were in a hurry to get back to school at that time?

"*A.* Yes, I was late from what I usually was, so I wanted to get back there as quick as I could. When that engine went by that I had to wait for, I did want to hurry up and get to school as quick as I could.

"*Q.* You wanted to hurry right along on down?

"*A.* Yes, sir.

"*Q.* You know that the tracks there, when you come up to those tracks that you have to be careful and look out for trains, don't you?

"*A.* Yes, sir.

"*Q.* You would have to do that every time you went across the track, had to be careful?

"*A.* Yes, sir. * * *

"*Q.* If a train hits you or a car or engine hits you, you know that it is apt to be a serious injury, don't you?

"*A.* Yes, sir.

"*Q.* You know that it might even kill you?

"*A.* Yes, sir.

"*Q.* You knew that at the time, on this day, you knew that if one of those engines or a car hit you, it would hurt you very badly, probably, didn't you?

"*A.* Yes, sir.

"*Q.* Now, going to school, when you got to those tracks did you use to think that you would have to be careful at those tracks so you would not be hit?

"*A.* No, sir; I didn't.

"*Q.* As a general rule when you came down there did you walk down those tracks without looking, or would you be careful not to get hit.

"*A.* I was looking to the north when I got hit.

"*Q.* I don't mean this day, but generally when you came along?

"*A.* Yes.

"*Q.* You would not walk right out onto the tracks without looking?

"*A.* No, sir.

"*Q.* You knew you had to look, so as to be careful and not get hit, didn't you?

"*A.* Yes, sir.

"*Q.* You knew that trains go by there quite often?

"*A.* Yes, sir  * * *

"*Q.* Whereabouts was that snow up there?

"*A.* Four or five feet from the track, just so the train could get by.

"*Q.* Is that where you were standing, did you walk up and stand on this snow?

"*A.* I stood on this side of it.  Right on this side of the snow as the train went by.  I don't know which track the first train that went by was on.

"*Q.* Do you know whether it was on the track nearest to you or on the middle track or on the track farthest away?

"*A.* I think it was on the track nearest to me.  And I stood out on the road and let the train go by nearest to me.  That train was coming from the north and going towards the south.  There were no cars with that engine.  That was just an empty engine, going as fast as a man could run.  That would be quite a little faster than I could run.  * * *

"*Q.* When this engine went by you had to wait for just a minute?

"*A.* Yes, sir

"*Q.* And then you started right up?

"*A.* Yes, sir.

"*Q.* Which way did you look when you started?

"*A.* I looked toward the north.

"*Q.* And how far had you gone when you got hit, do you know?

"*A.* I don't know how far I went.

"*Q.* Did you see what hit you at all?

"*A.* No, sir; I did not.

"*Q.* When this engine went by you looked up toward the north and then started ahead, and the next thing you knew you were hit?

"*A.* Yes, sir.

"*Q.* Is that right?

"*A.* The next thing I knew I fell to the ground. The next thing I knew after that I remember somebody carrying me in the house.

"*Q.* When you started up did you look down toward the south at all, or did you keep looking up toward the north all the time?

"*A.* I looked up toward the north.

"*Q.* You didn't look toward the south at all?

"*A.* Until the train got by, I watched it go by.

"*Q.* The engine?

"*A.* Yes.

"*Q.* That was before you started up, wasn't it?

"*A.* Yes, sir.

"*Q.* Before you started up you saw this engine go by?

"*A.* Yes, sir.

"*Q.* If that was running faster than a man could walk, it would not take it very long to run down about a rod or so, would it?

"*A.* No, sir; it goes pretty quick.

"*Q.* I understand you to say that you watched it while it went about a rod?

"*A.* Yes, sir.

"*Q.* Now you just glanced down toward the south and then turned and looked up toward the north?

"*A.* Yes, sir.

"*Q.* And then you kept looking up toward the north until you got hit?

"*A.* Yes, sir.

"*Q.* So you did not see this engine coming from the south at all, did you?

"*A.* No, sir. * * *"

On redirect examination the following occurred:

"I said I watched this first engine go by me and toward the south.

"*Q.* How far could you see that after it went by? Could you tell by something here in the room so that the jury would know about how far you could see it after it went by you?

"*A.* From here to you or farther. (Here counsel agreed that the distance was 18 or 20 feet.)

"*Q.* Why couldn't you see any farther south than that?

"*A.* Because there was a big snowbank there. I stood there until the engine went by and then started across. After I stopped watching the engine at the south and started to go across the track, I looked then toward the north.

"*Q.* Had you looked back again towards the south when the engine hit you?

"*A.* No, sir."

On recross-examination he testified:

"There were no trains up to the north when I looked up to the north. It was all clear.

"*Q.* Was there anything you were looking at up there?

"*A.* No, sir. When I started, I started to walk, and I kept on walking, walking fast. * * *

"*Q.* When you went up to this first train before you stopped running, how far did you run, how close to the first train did you stop?

"*A.* Well, I ran about six or seven feet away from the first track.

"*Q.* So the engine passed up right in front of you, did it?

"*A.* Yes, sir.

"*Q.* And as quick as that got up you started right on, did you?

"*A.* Yes, sir."

We have quoted at great length from the testimony of the plaintiff in order to present the situation as he described it. The situation just prior to the happening of the accident was fully described by the witness Rosebush, a boy about 19 years of age, who, with a

comrade, was between 50 and 100 feet north of Mosher street walking down the center track toward the place of the accident. His testimony is also lengthy, and we only quote briefly from it:

Direct examination:

"*Q.* About how far would you say you were from Mosher street crossing when the accident occurred?

"*A.* About fifty feet.

"*Q.* Did you see any other train or engine at that time, besides the one that hit the boy?

"*A.* Yes, sir.

"*Q.* Tell us what you saw.

"*A.* I saw one going up on the main track south, going south on the main track.

"*Q.* When you speak of the main track, which track do you mean?

"*A.* The center track.

"*Q.* How many tracks across Mosher street at that place?

"*A.* Three.

"*Q.* And the main is the center?

"*A.* The main is the center.

"*Q.* Did you see this little Henry boy before he was hurt?

"*A.* Yes, sir.

"*Q.* Did you see him at the time this engine went south?

"*A.* Yes, sir.

"*Q.* Where did you see him?

"*A.* He was coming up the hill from right behind on Mosher street, coming up the hill. There is a kind of a hill there before you go over the track. There is a grade runs up to the track above the level of the street. At the time this engine passed him he was about twenty feet from the track, as near as I could judge. I was on the west side of the main track, so I would be upon the opposite side of the engine from him. He would be on the east side and I on the west side, and the engine would pass between us. I saw him after the engine passed. He was on the south side of the road, on the side towards the sidewalk, out where the teams go. He was in the driveway towards the sidewalk, the south side.

"*Q.* What did he do after this engine went south?

"*A.* He started to walk across the track.

"*Q.* How far did he get?

"*A.* On the west side of the engine when it hit him. He got on the west side of the first track he would have to cross.

"*Q.* Did you see the engine that hit him?

"*A.* Yes, sir. It came from the south, backing up, on the first track on the east side. That would be on the track nearest to him. I think it is called the northbound. The engine had no cars. It was just backing up with the tender on the back end, at the north end, headed toward the south or State street, and moving with the tender toward the north. * * *

Cross-examination:

"*Q.* If you were standing on any one of those three tracks, or a matter of four or five feet outside of either outside track, can you still see down there five blocks and see an engine coming, if you know?

"*A.* Yes, sir. There is a curve on the other side of State street. From where the accident took place that would be about three blocks before it starts to curve. So for two or three blocks south of where the accident took place you can see right straight down. It does not interfere with your sight at all. The distance between the tracks is about eight feet. That is, between each set of tracks. I was about fifty feet north of the crossing and saw these two boys approaching the crossing coming toward the tracks. They were coming west. They were on the east side of the tracks, coming from my left-hand side. They was on the street where the horses travel.

"*Q.* You spoke about their coming up the hill. How much of a hill was there there?

"*A.* Oh, it is a small grade, a small slant in the road, it isn't very much. They were just coming up the slant, up to the tracks when I first saw them. * * *

"*Q.* Whereabouts was it, that engine coming from the depot, where did it pass the one going toward the depot?

"*A.* That passed that one just about right on that other crossing. There are two crossings very near together there you know. They passed on the first cross-

ing just a short distance south of the Mosher street crossing. * * *

"*Q.* As they came up, did you see whether those boys had stopped, or were they still coming right on?

"*A.* I didn't notice them stop. I seen the one—just the minute that engine got by he began to look north and he started to walk across the track. When I was up about fifty feet north of the place of the accident I saw this train go by from the north to the depot. I had seen the boys before that time. I seen them before that engine went by me, on Mosher street. They was walking, when I saw them, toward the tracks. Then when the engine going to the depot went by it shut off my view of the boys. Then the next time I saw them the boys were walking.

"*Q.* Did you see them stop at all from that time on until this little boy got hit?

"*A.* No; I didn't see them. When I was looking at them before the train to the depot went by they were walking towards the tracks, and when I next looked, they were still walking towards the tracks.

"*Q.* He walked right up onto the track that was farthest from you, did he?

"*A.* Yes; sir. That track farthest over to my left.

"*Q.* And he was looking up toward you, you say?

"*A.* Yes, sir.

"*Q.* Did you see him look down the other way at all?

"*A.* No, sir.

"*Q.* Was his head turned very much, was it looking right straight toward you or looking across the street?

"*A.* He was looking right straight towards the north.

"*Q.* And he looked that way all the time that you saw him, did he?

"*A.* Yes, sir.

"*Q.* And he continued to walk right onto the track that was farthest to your left?

"*A.* Yes, sir.

"*Q.* Which side of the tender was it that hit him, the side nearest to you or farthest from you?

"*A.* Nearest to me."

Describing the snowbank alluded to by the plaintiff, this witness said:

"It went about six or seven feet I think down toward the road, toward the east. It was just a pile at the corner like where they shoveled it off the tracks, it looked to me. Put into a pile right at the corner of the street and extended six or seven feet from east to west.

"*Q.* Back of that was there any snow piled?

"*A.* I didn't notice any.

"*Q.* Was there anything that you saw except just the level road there?

"*A.* No, sir."

This evidence was corroborated by that of the witness McComb, a boy 13 years of age at the time of the trial, which occurred about 8 months after the accident. This testimony is nowhere disputed, except as to the stopping. There the plaintiff differs from this witness. Many questions are raised and discussed by appellant, which we shall not find it necessary to consider. The only question which we shall discuss is that of plaintiff's contributory negligence, which question is properly raised upon the record. We might say in passing that there was no evidence of gross negligence of the defendant.

At the close of the plaintiff's evidence, the defendant moved the court to direct a verdict in its favor for many reasons, among them being that plaintiff's undisputed evidence conclusively showed that he, himself, was guilty of negligence. In denying the motion the court said:

"In regard to the direction of a verdict, I am quite free to say that if this had been an adult who was injured there, I would consider it my duty to direct a verdict, and I am not absolutely clear whether it is not my duty to direct a verdict as this case stands, considering the age and intelligence and capacity of the boy."

It is very evident from this uncontradicted testimony, that from the time the plaintiff reached the intersection of King and Mosher streets until he reached

the easterly end of the snowbank described by him, his view to the south was unobstructed, and we have his own word for it that while traversing that space he did not look in that direction. He was entirely familiar with the crossing, having used it daily during all that school year. He knew the number of tracks, and he knew that trains ran almost constantly on all of those tracks, in both directions, and that trains might be expected on either track, or any track at any time. He knew that it was his duty to be careful. He had been warned by his mother, and he knew that he had to use care in making this crossing and watch for trains. He had before waited for trains to pass, and had watched his time to cross in safety. He also testified that he knew that almost every day, when he returned to school after dinner, an engine, without cars, ran from the depot north, just as this engine was running on this day, and he had seen it many times before. According to his own witnesses, he looked only in one direction, that was north. According to his own witnesses he did not stop, but he claims that he did. But, taking the evidence in the view most favorable to the plaintiff as given in his testimony, it is his claim that he had been chased by the boys from the French School right up to the track where he had to stop and allow the train from the north to go by, that that went by pretty rapidly, and that he only waited for that and started forward again, in a hurry. The evidence is undisputed that there was a space 3 or 4 feet between the west end of the snowbank, described by the plaintiff, and the first rail of the east track. He was struck while passing off the west rail of the east track. He had this distance, at least, of unobstructed view. The plaintiff's own testimony is that he stopped about 6 or 7 feet from the east rail. He walked this distance before being struck.

Upon this question of contributory negligence the

following request, presented by defendant, was refused:

"I charge you that it was the duty of the plaintiff, upon approaching this crossing, and after arriving at a point where he could see engines approaching, to stop, look both ways, and listen, before attempting to cross the tracks, and that failure to do any one of the three will bar his recovery."

In the case of *Gardner* v. *Railroad Co.*, 97 Mich. 240 (56 N. W. 603), this court said:

"It was broad daylight, and, when within 5 feet of the north rail of the track, it is undisputed that the plaintiff could see 250 feet east along the main track. No one disputes that, if he had but looked, he certainly would have seen the train. It is evident, therefore, that he did not look, or, if he did, he saw the train, and carelessly attempted to cross in front of it; and in either case he was guilty of such negligence as to preclude a recovery."

See, also, *Kwiotkowski* v. *Railway Co.*, 70 Mich. 549 (38 N. W. 463) ; *Brady* v. *Railroad Co.*, 81 Mich. 616 (45 N. W. 1110) ; *Grostick* v. *Railroad Co.*, 90 Mich. 594 (51 N. W. 667) ; *McGee* v. *Railway Co.*, 102 Mich. 107 (60 N. W. 293, 26 L. R. A. 300, 47 Am. St. Rep. 507) ; *Braudy* v. *Railway Co.*, 107 Mich. 100 (64 N. W. 1056) ; *Lau* v. *Railway Co.*, 120 Mich. 115 (79 N. W. 13).

In *Brady* v. *Railroad Co.*, *supra*, this court said:

"A person about to cross a railroad track is bound to recognize the danger, and to make use of the sense of hearing and sight to ascertain, before attempting to cross, whether a train is in dangerous proximity. If he neglects to do this, and ventures blindly upon the track, it must be at his own risk; and such conduct should be pronounced negligence by the courts, as matter of law."

So, taking the plaintiff's own theory of the case and viewing all of the evidence in the light most favorable

to him, it is apparent that he proceeded from behind this claimed obstruction to his view, under such circumstances and with such knowledge of the situation, that his conduct was negligence as matter of law. That his injury could have been avoided cannot be doubted from his own statement. If the trial court was correct, and we think it was, that plaintiff's own version of this accident clearly showed his own negligence, had he been an adult, the only remaining question is whether or not the fact of plaintiff's age, 9 years and 6 months, in view of his undisputed appreciation of the danger, understanding of the situation and general conditions, can excuse his conduct, which would clearly have been negligence in an adult under the same circumstances. It seems to us that the following cases in this court are conclusive upon that subject: *Ecliff* v. *Railway Co.*, 64 Mich. 196 (31 N. W. 180) ; *Henderson* v. *Railway Co.*, 116 Mich. 368 (74 N. W. 525) ; *Trudell* v. *Railway Co.*, 126 Mich. 73 (85 N. W. 250, 53 L. R. A. 271) ; *Perego* v. *Railway Co.*, 158 Mich. 225 (122 N. W. 535) ; *Knickerbocker* v. *Railway Co.*, 167 Mich. 596 (133 N. W. 504) ; *Zoltovski* v. *Gzella*, 159 Mich. 620 (124 N. W. 527, 26 L. R. A. [N. S.] 435, 134 Am. St. Rep. 752).

In the case last above cited the plaintiff, a boy about 13 years old, while playing, ran across the street without looking for any vehicle which might be coming, and was injured by an automobile driven by the defendant. Justice HOOKER said:

"Was it contributory negligence in a 13 year old boy to become so engrossed in play as to run across a city street and immediately in front of an approaching automobile without thought to look to see whether such a machine or any other vehicle was approaching? In *Henderson* v. *Railway Co.*, 116 Mich. 368 (74 N. W. 525), an 8 year old boy ran into the front end of a street car. In that case his view was more or less obstructed by a coal wagon or another car going in a di-

rection opposite to that of the car that he ran into, and which wagon or car he ran behind in his approach to the track.  Mr. Justice MONTGOMERY said:

" 'It was but common prudence in crossing such a thoroughfare to look, not only for the car, but for any vehicle which might be coming.  Injury would have occurred from collision with an ordinary wagon just as surely as from running into this car, and from the testimony of the lad himself he had intelligence enough at the time to know this.  Why, then, should it be left for the jury to say that he had not?'

"See, also, *Ecliff* v. *Railway Co.*, 64 Mich. 203 [31 N. W. 180].

"While the injury to this child necessarily arouses the sympathy of all observers, it does not warrant the imposition of damages upon one who is not shown to have been blamable in the premises.  A verdict in this case would be, as the judge well said, a bestowal by the jury of 'charity from another man's pocket.' "

See, also, *Gibbs* v. *Dayton,* 166 Mich. 263 (131 N. W. 544) ; *Mollica* v. *Railroad Co.*, 170 Mich. 96 (135 N. W. 927) ; *Harris* v. *Crawley,* 170 Mich. 381 (136 N. W. 356) ; *Weil* v. *Railway,* 186 Mich. 614 (52 N. W. 959) ; *Otto* v. *Railroad Co., post,* 463 (155 N. W. 457).

This question was raised properly, and in our opinion is conclusive of the case.  It is unnecessary to discuss any other questions involved.

The judgment of the circuit court is reversed, and no new trial will be granted.

BROOKE, C. J., and PERSON, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.