ELLSWORTH EKDAHL v. MINNESOTA UTILITIES
COMPANY.[1]

September 30, 1938.

No. 31,646.

[1]Reported in 281 N. W. 517.

*Charles H. Weyl, Lystad, Mantor & Day,* and *Joseph F. Cowern,* for appellant.

*William R. Kueffner* and *Neumeier & Torinus,* for respondent.

HOLT, JUSTICE.

About 10:30 in the evening of May 8, 1936, in Marine on the St. Croix, Warren Ekdahl met instant death and James Schorr was severely shocked and burned when a wire cable which they were pulling contacted a high-tension electric transmission line of defendant. Ekdahl was almost 15 years and Schorr one year older. They will hereinafter be referred to as Warren and Jim, the names the witnesses used in the trial. Marine is a small village on the west bank of the St. Croix river. In 1922 defendant's electric transmission line was constructed there for power and lighting purposes. At the place of this accident there is the usual timber pole set 24 feet above ground with a double crossarm at the top having four insulators holding wires running east and west. The westerly uninsulated wire carried a current of 6,600 volts. Six feet below the crossarms was clasped a steel bracket to which a mast arm of steel was hinged so that when horizontal it extended southerly nearly 11 feet from the pole. At the end of this mast arm was a reflector and underneath a large, high-powered light bulb supplied by a current of 115 volts, the usual current for house and street lighting. To

lower the mast arm when a new light bulb had to be inserted, a woven wire cable was attached above the reflector and passed through a pulley fastened to the pole about three feet below the top crossarms, running down to a staple, on the south side of the pole, six feet above the ground. The cable had a hasp about three inches long, which went over the staple, and the cable ended in a loop or handhold below the hasp. After the hasp was over the staple, a bent wire was inserted in the staple to secure the hasp. If the light bulb had to be changed the maintenance man might back his truck against the pole, and, standing on the rear end, would withdraw the bent wire from the staple, pull out the hasp, and raise the cable until the mast arm hung perpendicularly, change the bulb, swing the mast arm out, and at the same time pull the cable down until the mast arm came to the horizontal position and the hasp came over the staple; or, standing on the ground, the maintenance man might tie a rope to the handhold of the cable, remove the hasp from the staple, pay out the rope until the mast arm assumed the perpendicular position, change the bulb, pull down the rope until the hasp reached the staple, and fasten and secure it by the bent wire. There was nothing to prevent the mast arm from being raised above the horizontal position. In fact, after it reached that position it took less effort to raise it so that the reflector and bulb could point upward, except that the cable would contact the 6,600-volt transmission wire above mentioned. This pole stands a few feet south of where three streets converge. Maple street, running east and west, here meets Broadway, running northwesterly, and Fifth street, coming from the northeast. In the angle formed by Fifth street and Maple street are the public school building and playground. Immediately southerly of and paralleling Maple and Broadway streets is a deep ravine spanned by a footbridge; from this bridge footpaths lead past this pole, and this light from the mast arm is to light the paths and bridge. It appears that at the school grounds, adjoining streets, and the paths and footbridge mentioned, the school children and youth congregate for frolic and play. On the evening in question some eight boys and girls, 14 to

17 years of age, spent about three-quarters of an hour in play and amusement around the footbridge, paths, and streets adjacent to the school grounds, and at about 10:30 concluded to start for their respective homes. Five of them walked up Broadway. One Ecklund loitered some 80 feet behind. Jim turned east toward his home on the south side of Maple street. No witness testified to seeing where Warren was or what he was doing until he called for help, when Jim turned around, saw Warren at the pole holding on to the cable, the mast arm below horizontal. Jim ran to his aid, took hold of the cable above Warren's hand, and both pulled down. They pulled too far, and the cable contacted the high voltage wire. Warren was thrown down clear of the cable. Jim was also thrown partly down, but could not let go of the cable, and sparks flew from his body. The Ecklund boy, seeing the light flicker among the trees, turned around, saw the position of Jim and Warren, gave the alarm, and all rushed down to the pole. One of them had sufficient presence of mind to kick the cable out of Jim's grasp. The mast arm dropped, the reflector and bulb smashed against the pole. Attempts at resuscitation were made and medical aid summoned. Warren was dead, but Jim revived. He had received 40 burns, 14 of which were third degree burns.

The complaint charged defendant with divers acts of negligence, among others that the high voltage wire was uninsulated, that the mast arm could be raised so that the cable would contact the high voltage wire, sending a death-dealing current into the cable, that the cable was not insulated, that the staple should have been placed higher on the pole so as to keep the cable out of reach of the curious, that there was no sign of warning on the pole or cable, and that the mast arm was not blocked so as to prevent possible contact between cable and the high-tension wire. Defendant denied negligence, averred that Warren's death was due to his own negligence while engaged in intentionally damaging defendant's property. There was a verdict for plaintiff, the administrator of Warren's estate, and defendant appeals from the order denying its motion for judgment *non obstante veridicto* or a new trial.

The assignments of error going to the contention that there is no evidence to sustain a finding of negligence against defendant are without merit. The jury could find that there was no occasion at all for having the mast arm so affixed that it could be raised above the horizontal position; that a clamp or knot could have been put on the cable between the mast end and the pulley so that it would have been impossible to contact the 6,600-volt wire with the cable; that for a trifling cost the cable could have been insulated some little distance above the hasp; and that according to good usage the staple should have been placed at least eight feet above the ground, beyond the reach of the curious. It would seem that a bare statement of some of the main facts clearly shows that the jury had ample ground for finding negligence of defendant. In transmitting such a deadly and invisible force as a high voltage current of electricity care commensurate with the danger of its escape is required. We need merely refer to the cases cited under note 29, § 2996, 2 Dunnell, Minn. Dig. (2 ed.). The location of this pole is so entirely different to that of the pole in Keep v. Otter Tail Power Co. 201 Minn. 475, 277 N. W. 213, that there is no need of pointing it out. The decision in Empire Dist. Elec. Co. v. Harris (8 Cir.) 82 F. (2d) 48, rests on the conclusion that there was no proof of the company's negligence.

The proposition that troubles the court is whether it should be held as a matter of law that Warren's negligence contributed to his death. Unquestionably his meddling with the cable set in motion the sequence of events that caused his death. Removing the hasp could not have been other than an intentional act of his. Could a jury rightfully excuse it on the ground of Warren's youth and lack of knowledge of the wrong and danger thereof? It must be conceded that he realized at once that he should not have tampered with the hasp, for when he could not get it back he called for aid to replace it. This call for help also satisfactorily shows that in what he did there was no intent or desire to injure or damage defendant's property. Defendant seems to concede that as to children of tender years the doctrine of attractive nuisance excuses the tres-

pass of the one injured or killed. The death penalty appears too severe a penalty for a youth's prank.

The contention that he violated 2 Mason Minn. St. 1927, § 10433, making the wilful interference with electric wires and lamps a misdemeanor, and therefore, as a matter of law, he was guilty of negligence, we regard as not sound. The court rightly submitted to the jury whether or not he violated that statute, and instructed them that if he violated the same he should be held negligent. The jury found that he did not wilfully violate the statute.

But, even so, the question remains whether or not his removing the hasp from the staple was an excusable act of trespass, under the attractive nuisance doctrine. This pole was not upon defendant's land. As to the ownership of the land or the demarcation of the southerly street line of Broadway and Maple streets, at the place where this pole stood, the record is silent. But it is evident that this pole with the mast arm light was placed to light the paths leading from the streets to the footbridge and that bridge, also that those paths and that bridge were for public travel. In passing upon the contributory negligence of one injured or killed by another's negligence, consideration must be given to what knowledge the one killed possessed, or should by the exercise of ordinary care have possessed, regarding the negligence of the other party, or, in this case, of the character of the attractive or alluring nuisance—the cable. There was nothing to indicate to anyone that this cable could affect anything else than the position of the light on the mast arm, operated by the nondangerous current used in the ordinary household. In Znidersich v. Minnesota Utilities Co. 155 Minn. 293, 296, 193 N. W. 449, 450, the late Chief Justice Brown, after citing decisions in an attractive nuisance case, made this statement in his usually forceful way:

"The differentiating element is found in the fact that the child injured has as much right in the street where the alluring instrumentality is maintained as the owner thereof, thus removing in a substantial way the element of unquestioned trespass necessarily presented where private property and premises are invaded. Bar-

rett v. Village of Princeton, 135 Minn. 56, 160 N. W. 190. The only element of trespass in the case where a public street is thus occupied is found in the technical wrong of the child in attempting to play with the offending attraction. And that act the jury may excuse, in the particular case, depending upon the alluring character of the article and the age and discretion of the child, with less hesitation perhaps than where there has been an actual invasion of the inclosed premises of another."

Applying the principle thus stated to this record, we conclude that it was for the jury and not the court to say whether or not this pole with the mast arm and cable, within easy reach of youths of Warren's age, was an alluring attraction or attractive nuisance (the nuisance consisting in the concealed death-dealing danger of the cable contacting the high voltage transmission wire). A technical trespass does not always affect a recovery or charge the one injured or killed in the trespass with contributory negligence. Faribault v. Northern States Power Co. 188 Minn. 514, 247 N. W. 680; Puchlopek v. Portsmouth Power Co. 82 N. H. 440, 136 A. 259. This doctrine of attractive nuisance has excused the technical trespass of children or youths of about the same age as Warren. Erickson v. W. J. Gleason & Co. 145 Minn. 64, 176 N. W. 199; Pierce v. United G. & E. Co. 161 Cal. 176, 118 P. 700; McKiddy v. Des Moines Elec. Co. 202 Iowa, 225, 206 N. W. 815. We do not believe courts should set the age limit at which, as a matter of law, an attractive nuisance ceases to allure a youth. It depends a great deal upon what the contrivance is, where located, and the development and understanding of the youth or child involved. Rightly the court declined to direct a verdict for defendant and did not err when refusing it judgment notwithstanding the verdict.

There are several assignments of error relating to the charge. We see nothing erroneous in those parts of the charge to which assignments of error numbered 7, 8, and 9 are directed. In fact assignment numbered 8 was defendant's requested instruction numbered I, and assignment numbered 9 was defendant's requested instruction numbered II, in substance.

Assignment numbered 10 relates to the court's interpretation of 2 Mason Minn. St. 1927, § 10433, embodied in the charge at defendant's request. The court correctly, we think, stated that this statute was directed against a wilful or malicious tampering or interference with defendant's pole and attachments, saying:

"If you find that he did intend to do some injury or damage to the defendant's property, then there would be a wilful interference with the property of defendant * * * and as such Warren would be guilty of negligence. But if the interference was not wilful, was not done with the intention to damage or injure the defendant's property, was not done in a spirit of malice, then you cannot find there was a violation of this statute on the part of Warren, and as such there would be no negligence in that respect."

The term "wilful" in criminal law denotes an evil intent or malice. 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 2410, and cases cited in note 19 to the word "wilful" on p. 810, vol. 6, of the Digest. We think the court's interpretation of this criminal statute substantially correct.

Error is also assigned upon this instruction (11th assignment of error):

"And in that connection the court instructs you that where a person is killed, if he is killed by the negligence of another, or if he is killed, the presumption is that he who was killed—was in the exercise of ordinary care at the time of the accident. * * * This is, however, merely a presumption and must yield to proof that due care was not exercised on the part of the person that met his death."

The rule as stated, though slightly deficient in diction, correctly states the law. As we understand the contention of defendant, it is not the language in which the rule was given to the jury, but the inapplicability of the rule to the situation which is found fault with. It is claimed that the evidence plainly discloses what Warren did, so that nothing is left to the presumption of his due care. Defendant on this point argues that the complaint alleges and the answer admits that Warren removed the hasp from the staple, so not only

the evidence but the pleadings reveal Warren's conduct and the presumption of due care is out of the picture, and that the mere statement of the rule even though accurately made was prejudicial to defendant. It is difficult to appreciate that any prejudice could result to defendant from the jury receiving information of this presumption, coupled as it was with the declaration that it must yield to proof that due care was not exercised by Warren. Moreover, it cannot be said truly that either the admission of the pleadings or the evidence discloses Warren's entire participation in the tragedy. While it is clear that Warren removed the hasp from the staple, the record is silent as to whether before he took hold of the cable the bent wire was in the staple. No one testified to seeing that bent wire at or near that pole either that night or the next morning. Warren is not here to tell whether or not it was there, nor as to what care he exercised in attempting to replace the hasp before he called for help. We cannot think defendant was harmed by the part of the charge attacked by assignment number 11.

The last assignment is that the court erred in denying a new trial on the ground of the excessive damages given under the influence of passion and prejudice. The verdict was for $7,500. The court granted a new trial unless plaintiff consented to a reduction of the verdict to $6,250. Plaintiff consented. While the verdict as reduced is liberal, we do not regard it so large that the inference is warranted that the jury were actuated by passion or prejudice. There were funeral expenses of $250, so the pecuniary loss to the parents is represented by $6,000. In this state for the loss of a 23-year old daughter a verdict for $6,000 was sustained in Waggoner v. Gummerum, 180 Minn. 391, 231 N. W. 10. A verdict in the same amount for the loss of a 19-year old daughter was held not excessive in Hartel v. Warren, 196 Minn. 465, 265 N. W. 282. In other jurisdictions larger verdicts have been sustained for loss of a child by wrongful act, viz., for the loss of a son seven years of age in O'Meara v. Haiden, 204 Cal. 354, 268 P. 334, 60 A. L. R. 1381, $10,000; for the loss of a 16-year old son in Vincent v. Morgan's L. & T. R. & S. S. Co. 140 La. 1027, 74 So. 541, $10,000; for the loss

of a son 16 years of age in Miller v. Hotel Savoy Co. 228 Mo. App. 463, 68 S. W. (2d) 929, $6,250; for the loss to his estate of an 8-year old boy in Autio v. Miller, 92 Mont. 150, 11 P. (2d) 1039, $15,000; for the loss of a 5-year old son in Lakeview, Inc. v. Davidson, 166 Okl. 171, 26 P. (2d) 760, $8,000; for the loss of an 18-year old daughter in Knutsen v. Dilger, 62 S. D. 474, 253 N. W. 459, $7,750; for the loss of a 17-year old son in Rio Grande, E. P. & S. F. R. Co. v. Dupree (Tex. Civ. App.) 56 S. W. (2d) 900, $10,500. In our opinion, there should not be a retrial because of excessive damages.

The order is affirmed.

LORING and OLSON, JUSTICES (dissenting).

We think the question of defendant's negligence and the contributory negligence of plaintiff's intestate presented jury issues. Our disagreement with the majority opinion is limited to the single question of whether the court was justified in instructing the jury that "where a person is killed, if he is killed by the negligence of another, or if he is killed, the presumption is that he who was killed—was in the exercise of ordinary care at the time of the accident." Obviously Warren Ekdahl was, as to this appliance, at least a technical trespasser. Only his youth and inexperience would permit the question of his contributory negligence to become one of fact instead of one of law. "Unquestionably his meddling with the cable set in motion the sequence of events that caused his death." That conclusion reached by the majority is founded upon the established facts and the necessary inferences to be drawn therefrom. This being so, where is there any room within which the claimed presumption can come into play? The case should go back for a new trial.

STONE, JUSTICE (dissenting).

It seems to me we are agreed that, if the suicidal conduct of the deceased had been that of an adult, he would have been guilty of contributory negligence as matter of law. This being so, it was prejudicial error to allow the jury to give any weight to the general presumption that one who is accidentally killed was guilty of no negligence proximately contributing to his death.

Hence it seems to me there should be a new trial. But there is no occasion for reëxamining the question of defendant's negligence. The verdict has settled that issue against it on adequate evidence. The new trial, in my judgment, should be limited to the single issue whether the youth of the deceased excused him from the charge of contributory negligence.

