**E. I. DU PONT DE NEMOURS & COM-PANY, a Corporation, Appellant,**

v.

**Ward EDGERTON, a Minor, by His Father and Natural Guardian, George Edgerton, Appellee.**

**No. 15359.**

United States Court of Appeals Eighth Circuit.

April 13, 1956.

Franklin D. Gray, Minneapolis, Minn. (Robert F. Henson and Cant, Taylor, Haverstock, Beardsley & Gray, Minneapolis, Minn., were with him on the brief), for appellant.

Richard J. Leonard, St. Paul, Minn. (Pierce Butler, III, and Doherty, Rumble & Butler, St. Paul, Minn., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VAN OOSTERHOUT, Circuit Judges.

GARDNER, Chief Judge.

This appeal is from a judgment for appellee, a minor, in an action brought by him to recover damages for personal injuries resulting from the explosion by him of a dynamite cap which had been found by his companion on premises owned by appellant E. I. du Pont de Nemours & Company. We shall refer to the parties as they appeared in the trial court.

It was alleged in the complaint that on April 8, 1952, and for a substantial time prior to that date defendant negligently maintained and allowed dangerous and attractive instruments on a certain tract of land owned by it in Ramsey County, Minnesota, upon which are located certain storage facilities of defendant; that it knew and had reason to know that persons were attracted to its property and it allowed such persons to enter onto and use its property; that it knew and had reason to know of the risk involved in allowing said dangerous instruments on its property while persons were in use of its property; that among the dangerous instruments allowed on the property were dynamite caps; that on the 8th day of April, 1952, plaintiff was injured by an explosion of a dynamite cap obtained from the premises of defendant and that plaintiff's permanent injuries were caused by the negligence of defendant in maintaining and allowing dangerous and attractive instruments on said property. Defendant answered denying all allegations of negligence and any knowledge as to the source of the dynamite cap which caused the injuries to plaintiff and alleged that the injuries to plaintiff were caused by his own negligence and that he had assumed the risk of injury to himself by his conduct. The action was tried to the court and a jury. As the sole question presented on the appeal is the sufficiency of the evidence to sustain the verdict, to avoid repetition we shall defer a development of the evidence until we consider its sufficiency.

At the close of plaintiff's evidence defendant interposed a motion for a directed verdict which motion was denied, whereupon defendant introduced evidence in support of its defense and at the close of all the evidence renewed its motion for a directed verdict on the following grounds:

"* * * that there is no issue of fact for the jury to determine,

and that upon the facts and the law the plaintiff has shown no right to relief and that there is no evidence of negligence on the part of the defendant, and even if there were any negligence, plaintiff's evidence and all the uncontroverted evidence in the case conclusively establishes, first, that the plaintiff was guilty of contributory negligence and that plaintiff's own negligence caused the damage which he has sustained; secondly, that Ward Edgerton voluntarily assumed the risk of injuries to himself by knowingly tampering with that instrumentality known to him to be dangerous and likely to cause him injury."

This motion was denied and the case was submitted to the jury on instructions to which no exceptions are here urged. The jury returned a verdict for plaintiff in the sum of $7,500. In due time defendant moved for judgment notwithstanding the verdict and the judgment entered thereon, which motion was by the court overruled.

From the judgment so entered defendant prosecutes this appeal, seeking reversal on substantially the following grounds: (1) The court erred in denying defendant's motion for a directed verdict interposed at the close of all the evidence because it appeared from the undisputed evidence that defendant was guilty of no negligence in the maintenance of its premises and that it had placed no dynamite caps in the household dump on its premises and that there was no evidence that it knew or should have known of the presence of dynamite caps in the dump on its premises and that there was no evidence that it knew or should have known that children were likely to trespass on the household dump on its premises, and (2) That plaintiff was at the time of receiving his injuries not an infant of tender years but an alert, mature young man of seventeen and one-half years of age and being a person of maturity was guilty of contributory negligence barring his right to recover.

In testing the sufficiency of the evidence to sustain the verdict we must view it in a light most favorable to the prevailing party and if when so viewed reasonable men might reach different conclusions then the case should be submitted to the jury. If, however, there is no substantial evidence reasonably warranting a difference of opinion then as a matter of law the court should direct a verdict. So viewed we summarize the evidence.

Ward Edgerton was injured by the explosion of a dynamite cap which his companion Wayne DeLange obtained from the household dump on the premises of defendant's explosive division in Ramsey County, Minnesota. The accident occurred on April 8th or 9th, 1952, at a time when Ward Edgerton was 17 years and 5½ months of age and Wayne DeLange was 17 years and 9 months of age. Ward graduated from high school no lower than the middle of his class within six weeks of the accident and Wayne quit high school within a few months of the accident although he was not short of any credits to join the Marine Corps. Ward at the time of trial was successfully pursuing a college course. The defendant owns approximately two hundred acres of land in Ramsey County, Minnesota, which it maintains for the storage of commercial explosives, including electric blasting caps. Explosives are stored by the defendant in magazines located in the interior of the property, near a lake called Lake Valentine, pending the sale of them to various consumers in the area. The property is bounded on its easterly side by Hamline Avenue and on the southerly side by the Soo Line Railway tracks. It is enclosed by a barbed wire fence consisting of four strands, except for the grounds immediately around the house and garage in the southeast corner of the property, which are enclosed by a woven wire fence. Part of defendant's land just north of its magazines is leased to Hercules Powder Company for its magazines. The house on defendant's premises is known as 3707 North Ham-

line Avenue and is occupied by the defendant's magazine keeper and his family. There are five gates to the premises: one for the house, one for the road to defendant's magazines, one for the road to the Hercules magazines, one for the farmer who rents pastureland in the premises, and one on the highway for the power company. Each of these gates had signs on them in April of 1952, and for a long time prior thereto, reading: "Dangerous—Keep Off; No Shooting Allowed on This Property". From time to time the signs were defaced by shotgun pellets but Wayne DeLange knew that there was a sign on the gate to the magazine road warning trespassers to keep off the premises. Wayne DeLange resides at 3655 North Hamline Avenue, St. Paul, Minnesota. As a boy he frequently fished on Lake Valentine. He knew defendant's magazine keeper Mr. Walter Bowers. Wayne entered defendant's premises to fish on the lake and to hunt mushrooms. Mr. Bowers saw him on the property a few times but never ordered him off. Mr. Bowers kept a household dump over a hill in back of the magazinekeeper's house toward the magazine road. He used the dump for disposal of tin cans, bottles and other things discarded from the house, as did his successor Werrill Current. Mr. Bowers never placed paper on the dump because of the danger of fire and neither Mr. Bowers nor Mr. Current ever dealt with loose dynamite caps or kept loose caps on the property. Neither ever sold dynamite caps in quantities less than a full carton nor ever placed any dynamite caps on the household dump. Wayne DeLange, plaintiff's companion, passed by the dump frequently and he sometimes examined the dump to see if there was anything he could use. Some two or three weeks before April 9, 1952, when passing this household dump he "rooted around through the pile" and found some wire and a number of electric dynamite caps. The caps were among cans which appeared to have been dumped within the preceding month. The caps were tarnished and some of the wires were snarled and some were folded. He took the caps home and placed them in the wall of the chicken coop.

On the evening of April 8th or 9th, 1952, at about 6:10 p. m., Ward Edgerton, plaintiff herein, who lived about one mile from the DeLange home drove over in his father's car to pick up Wayne's older brother, Ray. Wayne was in the chicken coop at the time and he showed Ward a dynamite cap. Wayne believes that he knew that the object was a dynamite cap but he is not sure and he is not sure whether he told Ward it was a dynamite cap. Both boys knew that the cap contained an explosive and both were interested in setting it off. Ward had seen dynamite set off in movies by electricity and he assumed that this cap could be set off by electricity.

At the trial both Ward and Wayne testified that several efforts were made to explode the cap outside the chicken coop before resort was had to building a fire within the coop. Although neither boy remembers whose idea it was they first sought to explode it by hooking it to the engine of Ward's father's car because they thought that the cap was designed to be set off by electricity. They attached one wire to a spark plug and the other wire to some other part of the car. Wayne stepped back and Ward started the car but the cap did not explode. After this unsuccessful effort to explode the cap they took it into the barn intending to set it off by striking it since they knew that ordinary caps are exploded in this way. Ward struck it with a sledge hammer or maul, first on a vise and then on the floor. The blows opened up the cylinder, at least one wire fell off and an orange-colored substance was exposed. Wayne then suggested placing the cap in a fire and for this purpose they built a fire in the chicken coop on a bench. After the cap was placed in the fire Ward went out the door and stood by the door about fifteen feet from the fire watching it. Wayne stood in the doorway about ten feet from the fire. He expected the cap to explode but he did not go far because he had to watch

the bench so that it would not catch fire. Although Ward expected that the cap would merely ignite and burn he thought that the safe thing to do would be to get away from the fire and he waited in the doorway for about two minutes. He then walked back in to look at the cap and when he reached a point some four or five feet from it the cap exploded and as a result Ward lost the sight of one of his eyes.

At the taking of his discovery deposition Ward testified that Wayne handed him a cap with wires attached and he took the wires and pulled the cap apart. Both Ward and Wayne knew that the object was a dynamite cap. Wayne built a fire on the bench in the chicken coop and Ward placed the cap in the fire. Both boys then walked back into the other room and waited for about two minutes. They were in the building all of the time. Ward then walked back to a point about five or six feet from the cap to make an inspection. He had no intention of staying there because he knew that the cap contained a dangerous explosive and he was apprehensive that it might explode. The cap exploded just as Ward was looking at it. Immediately following the accident plaintiff went to Dr. Lucian G. Culver and in giving a history of his injuries he stated that "he threw a dynamite cap in a fire and it went off".

Both boys said that they expected the cap to react like a firecracker but it definitely differed from a firecracker in appearance. Wayne told Ward that he got the cap from defendant's dump and Ward knew that the premises were used for the storage of explosives. Both boys had shot off firecrackers and knew that firecrackers do not always explode as rapidly as might be expected. At the time of the accident both boys also knew that the sale of fireworks was forbidden in the State of Minnesota because of the injury hazard. Defendant's magazine keeper, Mr. Gerald Barich, cleaned up the household dump in the fall of 1952 or 1953, and in so doing he did not observe any dynamite caps or other explosives but he did not know what was in each shovelful of rubbish. All of the persons employed by defendant on the premises from 1910 to the date of the accident testified that they had never placed any dynamite caps on the household dump.

 The complaint was apparently drawn on the theory that the household dump on defendant's premises was an attractive nuisance but it did not allege that the plaintiff at the time of the accident was a "young child." The attractive nuisance doctrine, however, has been discarded by the Supreme Court of Minnesota in Doren v. Northwestern Baptist Hospital Ass'n, 240 Minn. 181, 60 N.W. 2d 361, 42 A.L.R.2d 921 and in its stead it has adopted the rule set forth in 2 Restatement of the Law of Torts, Section 339 which reads as follows:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it and

(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

It is persuasively argued by defendant that there was no substantial evidence that the defendant was guilty of any negligence in the maintenance of its property or that it knew or should have

known of the presence of dynamite caps in the household dump on its premises, or that it knew or should have known that children were likely to trespass on the household dump on its premises. In view of our conclusion on the issue of plaintiff's contributory negligence, however, we assume without deciding that there was sufficient evidence to go to the jury on the question of defendant's negligence.

As has been observed, this plaintiff at the time of the accident resulting in his injuries was 17 years and 5½ months old. He was about to graduate from high school. There was no claim that he was mentally subnormal but he was manifestly mentally alert and graduated from high school with grades no lower than the middle of his class and he is now pursuing a college course. The rule subjecting the possessor of land to liability for bodily harm is limited to "young children". When does a minor cease to be a young child? Confessedly, the test is one of mentality, intelligence and maturity rather than of years but mentality, intelligence and maturity are usually measured to some extent by age. This is manifest from the very wording of the rule in the Restatement of the Law of Torts which has been adopted by the Minnesota Supreme Court as it uses the words "young children". "Young" certainly has reference to age. It has been generally held that after a minor has reached the age of fourteen there is no presumption that it is incapable of contributory negligence. On the contrary, the presumption is that a boy fourteen years old is sui juris, so as to be chargeable with contributory negligence. Fortune v. Hall, 195 N.Y. 578, 89 N.E. 1100; Gloshinsky v. Bergen Milk Transp. Co., 279 N.Y. 54, 17 N.E.2d 766; Flowers v. Pistella, 132 Pa.Super. 338, 200 A. 904; Sherris v. Northern Pac. R. Co., 55 Mont. 189, 175 P. 269.

In Nolley v. Chicago, M., St. P. & P. R. Co., 8 Cir., 183 F.2d 566, 567, a case governed by the laws of Minnesota, we held that a minor nine years of age was guilty of such contributory negligence as to

preclude his recovery for personal injury. In the course of the opinion it is said:

"* * * But we are not able to say that the evidence intended to establish the condition of clause (c) was such that the court under Minnesota law was required to have left this element also to the jury and so had no right to direct a verdict on the basis of it.

"The comment in the Restatement on § 339 makes this explanation of clause (c): 'The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger. Therefore, even though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with it or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved therein but none the less chooses to encounter it out of recklessness or bravado.'"

The Supreme Court of Minnesota has in a number of cases held that a minor younger than the plaintiff in this action was guilty of contributory negligence. Wineman v. Carter, 212 Minn. 298, 4 N.W.2d 83; Powers v. Chicago, M. & St. P. R. Co., 57 Minn. 332, 59 N.W. 307; Twist v. Winona & St. P. R. Co., 39 Minn. 164, 39 N.W. 402. In Wineman v. Carter, supra, the Supreme Court of Minnesota held a minor who was fifteen years of age guilty of contributory negligence and in the course of the opinion said, inter alia [212 Minn. 298, 4 N.W.2d 84]:

"True, the question of negligence is ordinarily one of fact. True, also, children are more readily excused from the charge of negligence than are adults. Hindal v. Kahler Corp., 167 Minn. 48, 208 N.W. 524;

Roberts v. Ring, 143 Minn. 151, 173 N.W. 437. That does not mean that the modern boy of normal intelligence, physique, and experience, who has reached his fifteenth year, cannot be chargeable with negligence as matter of law. Gibbs v. Dayton, 166 Mich. 263, 131 N.W. 544. He must be so charged when reasonable consideration of his conduct permits no other conclusion. That is this case. There is no suggestion that John Wineman was subnormal, physically or mentally. What he did and failed to do, admittedly causing the accident, we consider want of due care as matter of law."

Answering the argument that plaintiff, a minor, failed to realize the extent of the danger involved the Supreme Court of Minnesota in Twist v. Winona & St. P. R. Co., supra, among other things said [39 Minn. 164, 39 N.W. 406]:

"No one voluntarily and unnecessarily enters a danger which he knows to exist without expecting to escape it. In all cases of conscious self-exposure there is a failure to realize the extent or degree of the risk. But the act is nonetheless contributory negligence, if the party fails to exercise ordinary care."

Plaintiff and his companion were intelligent boys over seventeen years old about to graduate from high school. Plaintiff knew that what his companion had found was a dynamite cap. He so stated. They both knew it was an explosive and they undertook to explode it. Their acts clearly indicate not only that they knew it was an explosive but that they knew it had not been exploded. Plaintiff had seen dynamite exploded by electricity in the movies and he and his companion first sought to explode it electrically by attaching it to the engine of Ward's father's car. They attached one wire to a spark plug and the other wire to some other part of the car. As this attempt failed to explode the cap they then took it into the barn intending to set it off by striking it since plaintiff knew that ordinarily caps are exploded in this manner, and plaintiff struck it with a sledge hammer or maul, first on a vise and then on the floor. This too failed to explode the cap and plaintiff and his companion built a fire and plaintiff threw the cap, which had been burst open, into the fire and it is significant that he then retreated from the fire, manifestly to escape the effect of the expected explosion. The explosion did not occur promptly. He misgauged the time and returned near the fire when the explosion took place and caused his injury. It is notable that all these efforts whether prompted by recklessness or bravado were for one purpose—to effect an explosion of this dynamite cap. Certainly, plaintiff realized the danger involved in throwing this cap into the fire because he retreated some fifteen feet from the fire, presumably as a safety precaution.

Plaintiff cites and places great reliance on certain Minnesota cases, notably, Knox v. City of Granite Falls, Minn., 72 N.W.2d 67; Ekdahl v. Minnesota Utilities Co., 203 Minn. 374, 281 N.W. 517; Schorr v. Minnesota Utilities Co., 203 Minn. 384, 281 N.W. 523; Erickson v. W. J. Gleason & Co., 145 Minn. 64, 176 N.W. 199. These cases, however, are all readily distinguishable on their facts. For example, in Knox v. City of Granite Falls, supra, the victim was a little girl seven years old who was confessedly a "young child". Ekdahl v. Minnesota Utilities Co., supra, and Schorr v. Minnesota Utilities Co., supra, dealt with electrocution caused by a highly deceptive instrumentality, and the cases are in no way comparable in their facts with the present case. In Erickson v. W. J. Gleason & Co., supra, which had to do with an accident caused by the explosion of a dynamite cap the victim did not know it was an explosive and this fact is emphasized by the fact that he exploded it by simply scratching it with a piece of wire.

We cannot escape the conclusion that under the undisputed evidence in this case plaintiff as a matter of law was

guilty of such contributory negligence as to preclude his recovery and the court should have sustained defendant's motion for a directed verdict interposed at the close of all the evidence, or, not having done so, should have sustained defendant's motion for judgment notwithstanding the verdict. The judgment appealed from is therefore reversed and the cause remanded to the District Court with directions to dismiss the action on its merits.